IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| EDWARD D. LEWIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-274 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Edward D. Lewis, seeks judicial review of a
decision of defendant, Commissioner of Social Security ("the
Commissioner"), denying his application for disability insurance
benefits ("DIB") under Title II of the Social Security Act, 42
U.S.C. §§ 401-433.[1]  Presently before the Court are the parties'
cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56.
For the reasons set forth below, Plaintiff's motion for summary
judgment will be denied and the Commissioner's cross-motion for
summary judgment will be granted.

---

[1]Title II of the Social Security Act provides for payment of
insurance benefits to disabled workers who have contributed to
the Social Security Program.  Plaintiff's earnings record shows
that he acquired sufficient quarters of coverage for purposes of
eligibility for DIB to remain insured through June 30, 2008.  (R.
12).

1

## II. Background

### A. Procedural History

Plaintiff filed an application for DIB on June 16, 2004, alleging disability since January 15, 2003,[2] due to problems with his knee, ankle and heart, emotional problems and high blood pressure.[3]  (R. 79-81, 102).  Following the denial of his DIB application, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (R. 56).  Plaintiff and a vocational expert ("VE") testified at the hearing, which was held on May 20, 2005.  A non-attorney representative attended the hearing on Plaintiff's behalf.  (R. 219-45).

On January 10, 2006, the ALJ issued a decision denying plaintiff's application for DIB.  Specifically, the ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to perform a range of sedentary work existing in significant

---

[2]Although Plaintiff alleges an onset date of disability of January 15, 2003, the denial of a prior application for disability benefits on April 16, 2004 precludes Plaintiff from receiving DIB prior to April 17, 2004.  (R. 10, 29-39, 98).

[3]In a statement completed by Plaintiff in connection with his application for DIB, he listed the impairments that limit his ability to work as follows: 1. SEVERE KNEE AND ANKLE PAIN; 2. HIGH BLOOD PRESSURE; 3. HEART PROBLEMS - ARRHYTHMIA; 4. STOMACH PROBLEMS - ACID REFLEX (sic) DISEASE; 5. SLEEP DISORDER; 6. CARPAL TUNNEL SYNDROME; 7. MENTAL ISSUES - ANXIETY - CLAUSTROPHOBIC; 8. CHRONIC TENDONITIS; 9. SHORTNESS OF BREATH; and 10. SIDE EFFECTS FROM MEDICATIONS.  (R. 107).

2

numbers in the national economy.[4]  Therefore, he was not disabled

under the Social Security Act.  (R. 10-21).

On January 24, 2006, plaintiff requested review of the ALJ's

decision.  (R. 6).  The request, however, was denied by the

Appeals Council on August 15, 2007.  (R. 3-5).  This appeal

followed.

## B. Factual Background

Plaintiff's date of birth is February 2, 1964,[5] and he is a

high school graduate.  (R. 226).  At the time of the hearing

before the ALJ, Plaintiff, who is 5'7" tall, weighed 202 pounds.

(R. 227).

---

[4]RFC is the most a disability claimant can still do despite
his or her physical or mental limitations.  20 C.F.R.
§ 404.1545(a).  In his January 10, 2006 decision, the ALJ
described Plaintiff's RFC as follows:

"... the claimant has the residual functional capacity to
engage in a range of sedentary work that avoids balancing,
crawling or the use of ladders, ropes or scaffolds; avoids
unprotected heights, moving machinery or extremes in hot or
cold temperatures or excessive humidity; affords a sit/stand
option at fifteen to twenty minute intervals, if needed;
involves no more than simple, routine tasks; no interaction
with the public and no more than occasional interaction with
supervisors or coworkers."

(R. 13).

[5]Plaintiff was 41 years old at the time of the hearing
before the ALJ.

3

From January 1986 to January 15, 2003, Plaintiff was employed as a maintenance worker for the Johnstown Housing Authority ("JHA"). (R. 139, 228). On July 31, 2002, during the course of his employment with the JHA, Plaintiff sustained injuries to his left knee and ankle. Plaintiff eventually returned to work following the injuries. However, due to the unavailability of light duty work at the JHA, Plaintiff's employment was terminated on January 27, 2003. (R. 85, 227-29). Four days later, Plaintiff underwent surgery on his left ankle.[6] (R. 85).

Plaintiff continues to suffer from sharp pain in his left knee and ankle as a result of the work-related injuries. He wears a knee brace and an ankle brace which are prescribed by a pain management specialist. (R. 111, 229, 231). Plaintiff also has a history of carpal tunnel surgery (R. 232), and he suffers from shortness of breath, high blood pressure, sinus problems, a sleep disorder and acid reflux disease. (R. 230, 233-35). Plaintiff also suffers from panic attacks and depression for

---

[6]Dr. Carl Hasselman, an orthopedic specialist, began treating Plaintiff for his left ankle complaints in December 2002. Dr. Hasselman's diagnoses included left ankle instability (sprain) caused by torn ligaments and an osteochrondral injury of the posterior medial aspect of the talus, both caused by a twisting injury at work. Dr. Hasselman performed the surgery on Plaintiff's left ankle on January 31, 2003. (R. 85).

4

which he is treated by a psychiatrist and a therapist. (R. 138, 229-31, 234-35).

At the time of the hearing before the ALJ, Plaintiff was taking the following medications: Zoloft (depression), Trazadone (depression), Alprazolam (anxiety), Zyrtec (allergies), Nasonex (allergies), Celebrex (pain relief), Prilosec (acid reflux), Vasotec (high blood pressure), Tiazac (high blood pressure), Lopid (elevated cholesterol levels), Aspirin (heart problem), Percocet (pain relief) and Urecholine (digestive problems). (R. 140).

## C. Vocational Expert Testimony

At the hearing on Plaintiff's application for DIB on May 20, 2005, the ALJ asked the VE whether jobs existed for a hypothetical individual of Plaintiff's age, education and work experience who is limited to sedentary work with the following requirements:[7] (a) the need to avoid unprotected heights, moving machinery and temperature extremes; (b) no use of ladders, ropes or scaffolding; (c) no crawling or balancing; (d) the opportunity to change positions between sitting and standing every 15 to 20

---

[7]Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

5

minutes, if needed; (e) no more than simple, routine tasks with no public interaction; and (f) no more than occasional interaction with co-workers and supervisors. The VE responded affirmatively, citing the jobs of a table worker (210 jobs locally, 43,992 nationally), an addresser/mail sorter (160 jobs locally, 46,898 jobs nationally) and an electronics assembler (550 jobs locally, 218,191 jobs nationally). (R. 627).

## D. Medical Evidence

The medical evidence in the record may be summarized chronologically as follows:

On January 31, 2003, Dr. Carl Hasselman, an orthopedic specialist, performed surgery on Plaintiff to repair ligaments in his left foot. Subsequently, Dr. Hasselman performed arthroscopic surgery on Plaintiff's left ankle, as well as an osteochrondral transfer from the left knee to the left ankle for his talus.[8] The notes of a follow-up visit with one of Dr. Hasselman's associates on April 26, 2004, indicate that although Plaintiff's range of motion and stability in his left ankle were good, he remained symptomatic in his left ankle and both knees.[9]

---

[8]The talus is the small bone that sits between the heel bone and the two bones of the lower leg (tibia and fibula). *See* www.nlm.nih.gov/medlineplus/encyclopedia (last visited 8/26/2008).

[9]The notes of Dr. Hasselman's associate also indicate that Plaintiff has a history of bilateral knee injuries, including a patellar tendon rupture in his right knee in April 1993, a

Plaintiff's physical therapy program was continued, and his medication was changed from Percocet to Celebrex.[10] (R. 148).

On April 27, 2004, Plaintiff was seen by Dr. William Acosta, a neurologist, for pain management. Plaintiff reported "sharp" knee pain which he rated a level 6 out of 10 levels, and Plaintiff's physical examination was "[p]ositive for trouble walking." Dr. Acosta described Plaintiff's diagnosis as "Patella tendon rupture w/tendonitis & severe chronic pain." Dr. Acosta did not change Plaintiff's medications, which he noted were Percocet and Xanax.[11] However, the doctor increased Plaintiff's daily dosage of Xanax, and Plaintiff was instructed to return in one month. (R. 144-45).

During Plaintiff's next appointment with Dr. Acosta for pain management on May 25, 2004, Plaintiff reported "some major severe pain in his legs," although he was able to walk with the use of a cane. Plaintiff described his pain as "sharp," and he rated his pain level a 7. Again, Dr. Acosta noted that Plaintiff's

_____

patellar tendon rupture in his left knee in November 1999 that was repaired surgically and the removal of a meniscus from his left knee. (R. 148).

[10]Percocet, also known as Oxycodone, is used to relieve moderate to moderate-to-severe pain. Percocet can be habit-forming. Celebrex is used to relieve pain, tenderness, swelling and stiffness caused by, among other things, osteoarthritis. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 8/26/2008).

[11]Xanax is used to treat anxiety disorders and panic attacks. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 8/26/2008).

physical examination was "[p]ositive for trouble walking."
Plaintiff's medications (Percocet and Xanax) were continued, and
he was instructed to return in one month. (R. 142-43).

During Plaintiff's next appointment with Dr. Acosta for pain
management on June 22, 2004, Plaintiff reported that he continued
to suffer from "sharp" knee pain, which he rated a level 7.
Nevertheless, the office notes of this visit state: "...
Currently doing well. Neurologically there are no major changes.
He's still having problems w/his knee but he uses a walking cane
& everything is stable." Again, Dr. Acosta noted that
Plaintiff's physical examination was "[p]ositive for trouble
walking." (R. 141).

On June 24, 2004, Plaintiff was seen by his orthopedic
surgeon, Dr. Hasselman, for a follow-up visit. Plaintiff
reported that the pain in his ankle, which he rated a level 2,
had "markedly improved," but that his knees "bother him
significantly." In his office notes, Dr. Hasselman indicated
that Plaintiff had reached maximum medical improvement with
respect to his ankle injury. He also indicated that Plaintiff
was capable of light or sedentary work, although he noted that
Plaintiff's other verified medical problems would interfere with
his ability to find such work. (R. 147).

On July 7, 2004, Plaintiff's primary care physician, Dr.
George Pueblitz, completed a questionnaire in connection with

8

Plaintiff's application for DIB. With respect to Plaintiff's diagnoses, Dr. Pueblitz noted Plaintiff's history of a total left knee replacement in 1999 and left talofibular ligament tear and repair in 2003. As to Plaintiff's cardiopulmonary system, Dr. Pueblitz noted that Plaintiff suffers from shortness of breath related to panic attacks, and, as to his musculoskeletal/ neurological systems, Dr. Pueblitz noted that Plaintiff suffers from joint pain in both knees, occasional edema and painful range of motion in his foot. Dr. Pueblitz rated Plaintiff's motor power in his lower extremities a level 3 out of 5 levels. Regarding Plaintiff's mental status, Dr. Pueblitz noted that Plaintiff showed no evidence of emotional or cognitive disorder. (R. 129, 150-51).

Dr. Pueblitz also completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities on July 7, 2004, indicating that due to ankle and knee pain, Plaintiff's ability to lift and carry was limited to 10 pounds; his ability to stand and walk was limited to 1 hour or less; his ability to sit was limited to less than 1 hour; his ability to push and pull with his lower extremities was limited; and he should never engage in the following postural activities: bending, kneeling, stooping, crouching, balancing and climbing. (R. 153-54).

9

During his next appointment with Dr. Acosta for pain management on July 20, 2004, Plaintiff reported that the severe pain (a level 6) in his knees had not changed and interfered with his activities of daily living. Again, Dr. Acosta noted that Plaintiff's physical examination was "[p]ositive for trouble walking," and he continued Plaintiff's medications (Percocet and Xanax). (R. 209-10).

On July 26, 2004, Dr. Gerald Gryczko, a non-examining State agency medical consultant, completed a Physical RFC Assessment in connection with Plaintiff's application for DIB based on a review of Plaintiff's administrative file. Dr. Gryczko's opinion concerning Plaintiff's physical RFC differs significantly from the opinion of Dr. Pueblitz. Specifically, Dr. Gryczko opined that Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; that Plaintiff could stand and/or walk about 6 hours in an 8-hour workday; that Plaintiff could sit about 6 hours in an 8-hour workday; that Plaintiff's ability to push and pull with his lower extremities was limited; and that Plaintiff could occasionally balance, stoop, kneel and crouch but never climb or crawl. (R. 155-62).

On August 12, 2004, Sidney Segal, Ed.D., a non-examining State agency psychological consultant, completed a Psychiatric Review Technique form in connection with Plaintiff's application

10

for DIB, rendering the opinion that Plaintiff had no determinable mental impairment. (R. 163-76).

During his next appointment with Dr. Acosta for pain management on August 17, 2004, the doctor noted that Plaintiff was doing "fairly well," and that his prescribed medications "helped him to the point he's able to move around." With respect to Plaintiff's ability to work, Dr. Acosta noted that he told Plaintiff there were jobs he could perform. He just could not perform work that involved bending down and working on his knees. Again, Dr. Acosta noted that Plaintiff's physical examination was "[p]ositive for trouble walking," and he made no changes in Plaintiff's medications (Percocet and Xanax). (R. 207-08).

During his next appointment with Dr. Acosta for pain management on September 14, 2004, Plaintiff continued to report sharp knee pain, rating the pain a level 7. Nevertheless, Dr. Acosta indicated in his office notes that Plaintiff was "doing well." Dr. Acosta also indicated that Plaintiff's neurological examination was unchanged, and that Plaintiff was able to engage in most activities of daily living as a result of his pain medication. Again, Plaintiff's physical examination was "[p]ositive for trouble walking," and Plaintiff's medications (Percocet and Xanax) were continued. (R. 205-06).

During his next appointment with Dr. Acosta for pain management on October 12, 2004, Plaintiff continued to report

11

sharp knee pain, rating the pain a level 7. Dr. Acosta noted
that Plaintiff "really has some difficulty moving, esp[ecially]
bending, twisting of the knee is when it hurts." There were no
major changes in Plaintiff's neurological examination, and
Plaintiff denied any side effects from his medications. Again,
Plaintiff's physical examination was "[p]ositive for trouble
walking," and his medications (Percocet and Xanax) were
continued. (R. 203-04).

In the notes of Plaintiff's next appointment for pain
management on November 9, 2004, Dr. Acosta described Plaintiff as
"doing fairly well," although Plaintiff reported sharp knee pain,
rating the pain a level 8. Plaintiff's physical examination
continued to be "[p]ositive for trouble walking," and his
medications (Percocet and Xanax) were continued. (R. 201-02).

On December 2, 2004, Plaintiff was seen by Dr. Pueblitz for
complaints of insomnia. Dr. Pueblitz noted that Plaintiff had
tried various medications for his insomnia, including Ambien
which had helped.[12] Nervous anxiety was among Dr. Pueblitz's
diagnoses, and he ordered a sleep study for Plaintiff. (R. 193).

During his appointment with Dr. Acosta for pain management
on December 8, 2004, Plaintiff continued to report sharp knee

_____

[12]Ambien is used to treat insomnia (difficulty falling asleep
or staying asleep). *See* www.nlm.nih.gov/medlineplus/druginfo
(last visited 8/26/2008).

pain, rating the pain a level 7. Despite the pain, Dr. Acosta described Plaintiff as "doing well," indicating that Plaintiff was able to engage in activities of daily living. (R. 199-200).

The sleep study ordered by Dr. Pueblitz for Plaintiff was performed on December 28, 2004. The impression was described as severe insomnia and severe daytime hypersomnia which could be caused by Plaintiff's anxiety disorder. The sleep study was negative for sleep breathing disorder and periodic leg movements during sleep. Due to the significant anxiety component of Plaintiff's insomnia, a psychology/psychiatric referral was recommended. The doctor who performed the sleep study also noted that Plaintiff might benefit from a sedating antidepressant at bedtime. (R. 187-88).

In the notes of Plaintiff's next appointment for pain management on January 5, 2005, Dr. Acosta indicated that Plaintiff continued to do "fairly well;" that his neurological examination remained unchanged; that he continued to experience pain when walking, but, overall, he was stable; that he continued to deny side effects from his medications (Percocet and Xanax); that his physical examination was "[p]ositive for trouble walking;" and that he continued to rate his pain a level 7. (R. 197-98).

On January 12, 2005, Dr. James Millward, Plaintiff's treating psychiatrist, performed a re-assessment of Plaintiff's

13

mental status. Dr. Millward's diagnoses were Major Depressive
Disorder, single episode, moderate and Panic Disorder without
agoraphobia. Dr. Millward noted that Plaintiff was feeling "a
little better" since his dosage of Zoloft had been increased,[13]
and that Plaintiff was sleeping "a little better." Dr. Millward
rated Plaintiff's level of functioning on the Global Assessment
of Functioning ("GAF") scale a 47, denoting serious symptoms or
serious impairment in social or occupational functioning.[14]  (R.
185). In the notes of an office visit on January 31, 2005, Dr.
Pueblitz included depression among Plaintiff's diagnoses.  (R.
190).

    Plaintiff's next mental status re-assessment by Dr. Millward
took place on February 4, 2005. Dr. Millward continued to

---

[13]Zoloft is used to treat depression, obsessive-compulsive
disorder, panic attacks, posttraumatic stress disorder and social
anxiety disorder. See www.nlm.nih.gov/medlineplus/druginfo (last
visited 8/26/2008).

[14]The GAF scale is used by clinicians to report an
individual's overall level of functioning. It does not evaluate
impairments caused by physical or environmental factors. The GAF
scale considers psychological, social, and occupational
functioning on a hypothetical continuum of mental health to
illness. The highest possible score is 100 and the lowest is 1.
GAF scores between 41 and 50 denote the following: **"Serious
symptoms** (e.g., suicidal ideation, severe obsessional rituals,
frequent shoplifting) **OR any serious impairment in social,
occupational, or school functioning** (e.g., no friends, unable to
keep a job)." American Psychiatric Association: Diagnostic and
Statistical Manual of Mental Disorders, Fourth Edition, Text
Revision. Washington, DC, American Psychiatric Association, 2000,
at 32-34 (bold face in original).

14

diagnose Plaintiff with Major Depressive Disorder, single
episode, moderate. However, he changed Plaintiff's second
diagnosis to Panic Disorder *with* agoraphobia. The doctor noted
that since Plaintiff began taking Trazadone, he reported sleeping
better (3½ hours during the night and a "catnap" during the
day).[15] Plaintiff also reported that the increase in his Zoloft
prescription was "somewhat helpful." Although he continued to
suffer from panic attacks, Plaintiff reported that he had been
coping with the attacks better and he had been engaging in less
avoidance behavior, *i.e.*, he was not staying home "all the time."
Dr. Millward rated Plaintiff's score on the GAF scale a 49, and
he continued Plaintiff's medications (Zoloft, Trazadone and
Xanax). (R. 183).

On June 9, 2005, Vicki Hess, MSW, Plaintiff's mental health
therapist, prepared the following report for the Social Security
Administration's Office of Hearings & Appeals:

To Whom It May Concern:

This letter is in response to your request for information
on Edward Lewis. Mr. Lewis has been receiving counseling
services from me since December 29, 2004. His diagnoses are
Major Depression, single episode, in partial remission and
Panic Disorder with agoraphobia. Mr. Lewis has been
compliant with his attendance and treatment in therapy. At
present, Mr. Lewis is working on developing coping skills to
manage his panic attacks and his symptoms of depression.
Mr. Lewis experiences panic attacks which inhibit his

---

[15]Trazadone is used to treat depression. *See* www.nlm.nih.
gov/medlineplus/druginfo (last visited 8/26/2008).

ability to function in his daily routine. He has
experienced symptoms in session including profuse sweating,
shaking and difficulty getting his breath. He reports that
he often feels uncomfortable in crowds or in public places.
Mr. Lewis has made some progress in managing his depression;
however, his panic attacks are still occurring without
warning and continue to interfere with his day to day
activities.

\* \* \*

(R. 211).

On September 22, 2005, Steven Pacella, Ph.D., performed a
consultative psychological examination of Plaintiff at the
request of the Bureau of Disability Determination. With respect
to Dr. Pacella's observations, he noted that Plaintiff presented
with "stable and proportionate weight, adequate personal hygiene
and, while fully oriented, impressed as exceedingly lethargic and
prone to a good deal of irrelevant - even nonsensical -
commentary."[16] Noting the "obvious discrepancy" between
Plaintiff's behavior during the consultative examination and his
behavior as described in the medical records, Dr. Pacella's
diagnoses included: 1. Major Depression, single episode, in
partial remission; 2. Rule out Panic Disorder, with agoraphobia;
3. Pain Disorder, with physical and psychological factors; 4.
Chronic Benign Pain Syndrome; 5. Hypertension; 6. Insomnia; and
7. Severe Daytime Hypersomnia. Dr. Pacella described Plaintiff's

---

[16]In this connection, Dr. Pacella also noted that Plaintiff's
"exceedingly lethargic demeanor" precluded a reliable and valid
personality assessment. (R. 212).

16

prognosis as "fair," indicating that Plaintiff would not be able to understand, retain and follow more than simple instructions or to maintain concentration and task persistence for more than brief periods *if* you took his presentation during the consultative examination at "face value." In addition, Dr. Pacella indicated that Plaintiff would not be able to work within a schedule, attend to a task or sustain a consistent, competitive routine *if* his insomnia and daytime hypersomnia were as severe as his presentation. (R. 212-16). Finally, Dr. Pacella indicated that, as a result of his mental impairment, Plaintiff was moderately limited in his ability to understand, remember and carry out instructions and in his ability to respond appropriately to supervision, co-workers and pressures in a work setting. (R. 217).

### III. **Legal Analysis**

#### A. **Jurisdiction and Standard of Review**

The Court has jurisdiction of this appeal under 42 U.S.C. § 405(g), which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as

17

a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## B. The ALJ's Decision

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1). A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

18

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

\*   \*   \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.  20 C.F.R.
§ 404.1520(d).  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.  20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in

19

significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity. The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

\*   \*   \*

220 F.3d at 118-19.

With respect to the ALJ's application of the five-step

sequential evaluation process in the present case, steps one and

two were resolved in Plaintiff's favor: that is, the ALJ found

that Plaintiff had not engaged in substantial gainful activity

since his alleged onset date of disability, and the medical

evidence established that Plaintiff suffers from the following

severe impairments: obesity, patella tendon rupture with

tendonitis, chronic pain in his knees and left ankle, sleep

disorder secondary to anxiety, panic disorder without agoraphobia

and major depressive disorder, single episode, in partial

remission. (R. 13). Turning to step three, the ALJ found that

Plaintiff's impairments were not sufficiently severe to meet or

equal the requirements of any impairment in Listing 1.00 relating

to the Musculoskeletal System, Listing 3.00 relating to the

Respiratory System, or Listing 12.00 relating to Mental

Disorders, or any other impairment listed in 20 C.F.R., Pt. 404,

Subpt. P, App. 1.[17] (R. 13). As to step four, the ALJ found

that Plaintiff is unable to perform his past relevant work as a

maintenance worker due to the exertion requirements (heavy) of

the job. (R. 19). Finally, regarding step five, based on the

testimony of the VE, the ALJ found that considering Plaintiff's

age, education, past work experience and RFC, there are a

significant number of sedentary jobs in the national economy

which Plaintiff could perform, including the jobs of a table

worker, an addresser/mail sorter and an electronic assembler.

(R. 20).

## C. Discussion

Plaintiff raises four arguments in support of his motion for

summary judgment which will be addressed seriatim.

### Weight Accorded Treating Source Opinions

Initially, Plaintiff asserts that the ALJ erred by failing

to give controlling weight to the medical opinions of his primary

care physician, Dr. Pueblitz, and his psychiatrist, Dr. Millward,

---

[17]Appendix 1 to Subpart P of Part 404 of the Social Security
Regulations lists various impairments in the following
categories: 1.00 Musculoskeletal System, 2.00 Special Senses and
Speech, 3.00 Respiratory System, 4.00 Cardiovascular System, 5.00
Digestive System, 6.00 Genitourinary Impairments, 7.00
Hematological Disorders, 8.00 Skin Disorders, 9.00 Endocrine
System, 10.00 Impairments That Affect Multiple Body Systems,
11.00 Neurological, 12.00 Mental Disorders, 13.00 Malignant
Neoplastic Diseases and 14.00 Immune System. If a claimant's
impairment meets the requirements of a listed impairment or its
equivalent, he or she is *per se* disabled and automatically
eligible for benefits with no further analysis. Burnett, 220
F.3d at 119.

21

that he is disabled.[18]  In this connection, an ALJ is required to adopt a treating source's medical opinion, *i.e.*, an opinion regarding the nature and severity of a claimant's impairments, in one narrowly defined circumstance.  Specifically, the Social Security Regulations provide that an ALJ is not permitted to substitute his or her own judgment for the opinion of a treating source on the nature and severity of a claimant's impairments when the treating source has offered a medical opinion that "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."[19]  *See* 20 C.F.R. § 404.1527(d)(2).

---

[18]Specifically, in his brief, Plaintiff asserts that "... the unfavorable decision in this case should be vacated and the findings and opinions of the treating physician and psychiatrist adopted as binding in this case justifying an award of benefits." (Pl's Brief in Support, p. 19).

[19]When a treating source's medical opinion is not accorded controlling weight, the Social Security Regulations provide that the ALJ is to apply the following factors in determining the weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence supporting the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating source rendering the opinion is a specialist in the applicable area; and (6) any other factor which tends to support or contradict the opinion.  In all cases, an ALJ is required to give good reasons in his or her decision for the weight accorded a treating source's medical opinion.  *See* 20 C.F.R. § 404.1527(d)(2)-(6).

Turning first to the ALJ's failure to give controlling weight to the opinion of Plaintiff's primary care physician, as noted previously, on July 7, 2004, Dr. Pueblitz completed a questionnaire concerning Plaintiff's medical conditions and a Medical Source Statement regarding Plaintiff's ability to perform work-related physical activities in light of his medical conditions. In the Medical Source Statement, Dr. Pueblitz opined, among other things, that Plaintiff's ability to stand and walk was limited to 1 hour or less in an 8-hour work day, and his ability to sit was limited to less than 1 hour in an 8-hour work day, due to ankle and knee pain. If well-supported and not inconsistent with other substantial medical evidence in the record, these limitations would compel a finding that Plaintiff is disabled because sedentary work generally requires the ability to stand and walk for 2 hours during an 8-hour work day and the ability to remain in a seated position for 6 hours during an 8-hour work day. *See* Social Security Ruling 96-9p.[20]

Plaintiff argues that the ALJ impermissibly substituted his own medical opinion for the opinion of Dr. Pueblitz because he rejected the doctor's physical RFC assessment dated July 7, 2004 based on "unnamed discrepancies between the objective findings of

---

[20]Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).

Dr. Pueblitz and his conclusions [which] suggested that the doctor did not complete the assessment with particular care." (Pl's Brief in Support, p. 17). A review of the ALJ's decision does not support this argument. The ALJ did, in fact, identify discrepancies between Dr. Pueblitz's objective findings in the questionnaire and his conclusions in the Medical Source Statement. Specifically, the ALJ noted that although Dr. Pueblitz indicated in the questionnaire concerning Plaintiff's medical conditions that Plaintiff has 20/20 vision, no hearing impairment, clear speech, normal reflexes, normal sensation, no motor power deficit in his upper extremities, normal grip strength and no limitations in his ability to perform fine and dexterous movements, in the Medical Source Statement completed the same day, Dr. Pueblitz indicated that Plaintiff had unspecified limitations with respect to seeing, hearing, speaking, reaching, handling, fingering and feeling. (R. 18).

Plaintiff also argues that the ALJ impermissibly substituted his own medical opinion for the opinion of Dr. Pueblitz because he rejected Dr. Pueblitz's physical RFC assessment in the Medical Source Statement completed on July 7, 2004, without referring to evidence in the record from another physician that contradicted Dr. Pueblitz's opinion. (Pl's Brief in Support, p. 17). Again, a review of the ALJ's decision does not support Plaintiff's argument. The ALJ did, in fact, refer to medical evidence in the

record that did not support the extent of the physical
limitations imposed upon Plaintiff by Dr. Pueblitz in the July
2004 Medical Source Statement.  The ALJ noted, among other
things, that (a) in April 2004, Dr. Acosta, Plaintiff's treating
pain specialist, reported that Plaintiff's gait and station were
normal (R. 15, 144);[21] (b) in April 2004, an associate of Dr.
Hasselman, Plaintiff's orthopedic surgeon, reported that
Plaintiff's range of motion in his left ankle was good, his
incision was well-healed and his stability was good (R. 15, 148);
(c) in June 2004, Dr. Hasselman reported that although Plaintiff
had mild crepitus in his ankle, his ankle pain had "markedly
improved" (R. 15-16, 147); (d) in June 2004, Dr. Hasselman
indicated that Plaintiff was capable of performing light or
sedentary work (R. 18, 147); (e) in July 2004, Dr. Pueblitz
reported that Plaintiff's reflexes and sensation were within
normal limits, his balance was good and his gait was normal (R.
16, 150-51); (f) in July 2004, a non-examining State agency
physician completed a Physical RFC Assessment for Plaintiff and
concluded that Plaintiff was capable of performing light work (R.
19, 155-62);[22] (g) in August 2004, Dr. Acosta informed Plaintiff

_____

[21]The Court notes that on this date, Dr. Acosta also reported
that Plaintiff displayed no abnormality with respect to his motor
systems; that Plaintiff's strength and tone were good throughout;
and that Plaintiff had no observable atrophy.  (R. 145).

[22]With respect to the medical opinions of non-examining
sources, the Social Security Regulations provide: "[ALJs] are not

25

that he was capable of performing work that did not involve
bending down or kneeling (R. 18, 207); (h) in September 2004, Dr.
Acosta noted that Plaintiff reported an ability to perform most
activities of daily living due to his pain medications (R. 16,
205); (i) in October 2004, Dr. Acosta noted that Plaintiff
reported no side effects from his medications (R. 16, 203); and
(j) in December 2004, Dr. Acosta noted that Plaintiff reported an
ability to engage in activities of daily living (R. 16, 199).

Turning next to the ALJ's alleged error in failing to accord
controlling weight to the opinion of Plaintiff's treating
psychiatrist, the records of Dr. Millward in Plaintiff's
administrative file are sparse.[23]  The two one-page re-assessment
forms completed by Dr. Millward may be summarized as follows:[24]

---

bound by any findings made by State agency medical or
psychological consultants.... However, State agency medical and
psychological consultants ... are highly qualified physicians and
psychologists who are also experts in Social Security disability
evaluation.  Therefore [ALJs] must consider findings of State
agency medical or psychological consultants ... as opinion
evidence, except for the ultimate determination about whether [a
claimant is] disabled."  20 C.F.R. 404.1527(f)(2)(i).

[23]It appears from the record that Dr. Millward did not begin
treating Plaintiff for his mental impairments until December
2004, five months before the ALJ hearing in this case.

[24]The only other document in Dr. Millward's records is a
handwritten notation regarding a telephone call from Plaintiff to
report the results of his sleep study.  The notes, however, do
nothing more than record Plaintiff's interpretation of the sleep
study results.  (R. 184).

26

January 12, 2005:

  Plaintiff's diagnoses included Major Depressive Disorder,
single episode, moderate and Panic Disorder without
Agoraphobia.  Plaintiff reported that he was feeling "a
little better" since his dosage of Zoloft had been
increased; that the only side effect from his medications
was a sexual side effect; and that he was sleeping "a little
better."  Dr. Millward rated Plaintiff's GAF score a 47 at
that time.

February 4, 2005:

  Plaintiff's diagnoses included Major Depressive Disorder,
single episode, moderate and Panic Disorder with
Agoraphobia.  Plaintiff reported that since he began taking
Trazadone, he was sleeping 3½ hours a night and taking a
"catnap" during the day.  Plaintiff's dosage of Zoloft had
been increased by his primary care physician, and Plaintiff
reported that the increase had been "somewhat helpful."
Although Plaintiff continued to report panic attacks, he
also reported that he was coping with the attacks better and
that he had been engaging in less avoidance behavior, *i.e.*,
not staying home "all the time."  Dr. Millward rated
Plaintiff's GAF score a 49 at that time.

(R. 183, 185).

     Plaintiff argues that the ALJ impermissibly substituted his

own medical opinion for the opinion of Dr. Millward that he is

disabled because the ALJ failed to accept the restrictions placed

upon him by Dr. Millward.  (Pl's Brief in Support, p. 18).

Plaintiff, however, fails to identify the alleged restrictions,

and the Court can find no restrictions placed upon him by Dr.

Millward in the medical evidence in this case.

     Plaintiff argues further that the ALJ impermissibly

substituted his own medical opinion for the opinion of Dr.

Millward that he is disabled because the ALJ did not accept the

27

GAF scores assigned to him by Dr. Millward which indicate that Plaintiff's mental impairments "are severe and prevent employment among other limitations." (Pl's Brief in Support, p. 18). This argument also is unavailing.

Contrary to Plaintiff's argument, a GAF score of 47 or 49 may indicate problems that do not necessarily relate to the ability to hold a job. Therefore, standing alone, the GAF scores assigned to Plaintiff by Dr. Millward in January and February 2005 do not evidence an impairment seriously interfering with Plaintiff's ability to work, and Dr. Millward did not indicate that Plaintiff could not work. Lopez v. Barnhart, 78 Fed.Appx. 675 (10th Cir.2003). *See also* Ramos v. Barnhart, 2007 WL 1008495 (E.D.Pa.2007)(Neither the regulations nor case law requires an ALJ to determine a claimant's disability based solely on a GAF score).

Moreover, in his decision, the ALJ adequately set forth the medical evidence supporting his finding that Plaintiff's mental impairments did not preclude substantial gainful activity. For example, the ALJ noted that (a) in July 2004, Plaintiff attributed "his difficulty with shopping to problems standing and walking, not to anxiety when he was out of his home or around other people," and he indicated that he could go shopping for small orders (R. 16); (b) Plaintiff began counseling for depression and panic disorder in December 2004, and, by January

28

2005, Plaintiff reported to Dr. Millward that he was doing better
with the prescribed medications (R. 16); (c) in February 2005,
Plaintiff reported to Dr. Millward that he was no longer staying
home all the time (R. 16); (d) the record contained strong
evidence that Plaintiff was exaggerating his symptoms, *i.e.*, the
discrepancies between Dr. Pacella's observations of Plaintiff
during the consultative psychological examination on September
22, 2005 and the notations in the medical records of Dr. Acosta
and Dr. Pueblitz regarding Plaintiff's mental functioning (R. 16-
17); (e) Dr. Pacella opined following the consultative
psychological examination that Plaintiff was moderately limited
in his ability to understand, remember and carry out instructions
and in his ability to respond appropriately to supervision, co-
workers and pressures in a work setting (R. 17-18); (f) the
therapist's statement concerning Plaintiff's panic disorder in
her one-paragraph letter dated June 9, 2005 is not supported by
treatment notes (R. 17); and (g) the few progress notes which
were submitted in connection with Dr. Millward's treatment of
Plaintiff for his mental impairments showed improvement at each
session (R. 17).

Based on the foregoing, the Court concludes that the ALJ's
failure to accord controlling weight to Dr. Pueblitz's July 7,
2004 physical RFC assessment and the GAF scores assigned to

29

Plaintiff by Dr. Millward in January and February 2005 is
supported by substantial evidence.[25]

## Failure to Consider Plaintiff's Insomnia and
## Hypersomnia as Separate Impairments

As noted previously, in his decision, the ALJ determined
that Plaintiff's severe impairments included a "sleep disorder
secondary to anxiety." (R. 13). Plaintiff asserts that the ALJ
erred by failing to analyze his diagnoses of insomnia and
hypersomnia as separate severe impairments. After consideration,
the Court finds Plaintiff's argument unpersuasive.

Plaintiff bases his second argument, in large part, on the
report of his sleep study in December 28, 2004. Specifically,
Plaintiff asserts: "The doctor in charge of the study ... found
that the plaintiff suffered from a severe insomnia and severe
daytime hypersomnia, as well as, an anxiety disorder caused by
those two conditions. However, in the decision of the [ALJ], the

_____

[25]In his brief, Plaintiff refers to Dr. Pueblitz and Dr.
Millward as the "primary treating physicians" in this case,
ignoring his other significant treating sources - Dr. Hasselman,
the orthopedic surgeon who operated on Plaintiff's left ankle and
knee in January 2003 and followed up on Plaintiff's status until
June 2004, and Dr. Acosta, the pain management specialist who
treated Plaintiff on a monthly basis between April 2004 and
January 2005. With regard to Plaintiff's exclusion of these
treating sources as "primary treating physicians," it is
interesting to note that in June 2004, Dr. Hasselman rendered the
opinion that Plaintiff was capable of light or sedentary work (R.
147), and in August 2004, Dr. Acosta rendered the opinion that
Plaintiff was capable of performing work that did not involve
bending down or working on his knees (R. 207).

30

[ALJ] stated that the plaintiff's sleep disorder was attributed to his level of anxiety." (Pl's Brief in Support, p. 19).

A review of the report of the sleep study shows that it is Plaintiff who has misinterpreted the report, not the ALJ. First, the report states that Plaintiff admitted that his insomnia and daytime sleepiness had a "significant anxiety component." (R. 178). Second, in the IMPRESSION section of the report, the doctor who performed the sleep study specifically stated that Plaintiff's insomnia and daytime hypersomnia "could be" caused by his anxiety disorder. (R. 178). Finally, in the RECOMMENDATIONS section of the report, the doctor states: "Given the significant anxiety component, psychological/psychiatric referral is recommended." (R. 179). Simply put, Plaintiff's interpretation of the report of the December 2004 sleep study is erroneous.

Moreover, as noted by the Commissioner, the ALJ's credibility determination with respect to the severity of Plaintiff's sleep disorder was supported by substantial evidence. (Df's Brief in Support, p. 19). First, the ALJ noted that during the sleep study in December 2004, Plaintiff reported that he "frequently [fell] asleep unintentionally, including falling asleep while driving." However, in a questionnaire completed in July 2004, Plaintiff reported that he avoided driving due to inattentiveness resulting from his pain medications. He did not

31

mention falling asleep while driving.[26]  Second, the ALJ noted

that none of Plaintiff's medical records contain a notation

regarding falling asleep while driving or without warning.

Third, the ALJ noted that Plaintiff testified during the hearing

in May 2005 that he continued to drive.[27]  Fourth, the ALJ noted

that during Plaintiff's October 2004 and January 2005

appointments with Dr. Acosta, the pain management specialist, he

denied any side effects from his medications.  (R. 197, 203).

Finally, the ALJ noted that the report of Plaintiff's

consultative psychological examination by Dr. Pacella is a strong

indication that Plaintiff's statements were not entirely credible

with respect to the severity of his insomnia and hypersomnia.[28]

(R. 212-16).

---

[26](R. 118).

[27](R. 226).

[28]In his report, Dr. Pacella states "[i]f you take
[Plaintiff's] presentation today at face value" and "[i]f
[Plaintiff's] insomnia and daytime hypersomnia are as severe as
his presentation, suggesting doubt on the doctor's part regarding
the genuineness of Plaintiff's exceedingly fatigued presentation
that day.  Doubt on the doctor's part also is suggested by his
reference in the report to the discrepancies between Plaintiff's
exceedingly fatigued presentation that day and the notes of his
treating sources.

## Social Security Ruling 96-8p

Next, Plaintiff asserts that the ALJ erred by failing to comply with SSR 96-8p which requires an ALJ to engage in a function by function assessment when determining a disability claimant's RFC.[29] Again, the Court finds Plaintiff's argument unpersuasive.

As noted by the Commissioner,[30] the ALJ took Plaintiff's knee impairment into consideration and accommodated this impairment by limiting Plaintiff to sedentary work with a sit/stand option at 15 to 20 minute interval that does not involve balancing, crawling or use of ladders, ropes or scaffolds. The ALJ also took Plaintiff's sleep disorder into consideration and accommodated this impairment by restricting Plaintiff to sedentary work that does not involve working at unprotected heights, working around moving machinery or performing more than simple, routine, repetitive tasks. Finally,

---

[29]SSR 96-8p provides that an ALJ's RFC assessment must address both the remaining exertional and nonexertional capacities of the individual. Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling. Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength. It assesses an individual's ability to perform postural, manipulative, visual, communicative and mental activities, as well as an individual's ability to tolerate various environmental factors, such as temperature extremes.

[30]Df's Brief in Support, pp. 20-21.

the ALJ took Plaintiff's depression and panic disorder into consideration and accommodated these impairments by limiting Plaintiff to sedentary work that does not involve interaction with the public or more than occasional interaction with supervisors and co-workers. In sum, after considering the decision as a whole, the Court is satisfied that the ALJ complied with the requirements of SSR 96-8p.

## Hypothetical Questions to VE

Finally, Plaintiff argues that the VE's response to the ALJ's hypothetical question does not constitute substantial evidence supporting the decision in this case because the hypothetical question did not include the limitations caused by his insomnia and hypersomnia. (Pl's Brief in Support, p. 22). After consideration, the Court agrees with the Commissioner for the reasons stated with respect to Plaintiff's other arguments in support of his motion for summary judgment that the hypothetical question posed to the VE by the ALJ adequately covered the severity of the limitations resulting from Plaintiff's physical and mental impairments which are supported by the credible evidence in the record. (Df's Brief in Support, pp. 21-22). Accordingly, the VE's response to the ALJ's hypothetical question

constitutes substantial evidence supporting the ALJ's adverse
determination in this case.

_William L. Standish_
William L. Standish
United States District Judge

Date: August 28, 2008